UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

VLADIMIR ALEXIS MORILLO-VIDAL,

              Defendant.

------------------------------------X

S2 10 Cr. 222 (RWS)

SENTENCING OPINION



**Sweet, D.J.**

        On December 7, 2010, Vladimir Alexis Morillo-Vidal,
("Morillo-Vidal" or "Defendant") was found guilty of one count
of conspiracy to distribute and possess with intent to
distribute five grams and more of cocaine, in violation of 21
U.S.C § 841(b)(1)(A), and one count of attempt to distribute and
possess with intent to distribute five grams and more of
cocaine, in violation of 21 U.S.C. § 841(b)(1)(A).  For the
reasons set forth below, Morillo-Vidal will be sentenced to 120
months' imprisonment to be followed by 5 years' supervised
release.  Defendant will forfeit to the United States all
property involved in the offense or traceable to it.  Morillo-
Vidal will also be required to pay a special assessment of $200.

1

## Prior Proceedings

On October 19, 2010, Indictment S2 10 CR 222 (RWS) was filed in the Southern District of New York.

Count 1 charges that from at least October 2009, through and including March 4, 2010, in the Southern District of New York and elsewhere, Morillo-Vidal, a/k/a "Vladimir Morillo," John Cartagena ("Cartagena"), and others known and unknown, conspired to distribute and possess with intent to distribute five grams and more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) & 846.  Count 2 charges that on March 4, 2010, in the Southern District of New York and elsewhere, Morillo-Vidal attempted to distribute and possess with intent to distribute five grams and more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) & 846, 18 U.S.C. § 2.

On December 7, 2010, Defendant was found guilty of Counts 1 and 2.

Morillo-Vidal's sentencing is currently scheduled for September 27, 2011.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines.  Thus, the sentence to be imposed here is the result of a consideration of:

    (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)   the need for the sentence imposed —

        (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)   to afford adequate deterrence to criminal conduct;

        (C)   to protect the public from further crimes of the defendant; and

        (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)   the kinds of sentences available;

    (4)   the kinds of sentence and the sentencing range established for —

        (A)   the applicable category of offense committed by the applicable category of defendant as

set forth in the guidelines . . .;

(5)   any pertinent policy statement . . . [issued
      by the Sentencing Commission];

(6)   the need to avoid unwarranted sentence
      disparities among defendants with similar
      records who have been found guilty of
      similar conduct; and

(7)   the need to provide restitution to any victims of
      the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find
all the facts appropriate for determining a sentence, whether
that sentence is a so-called Guidelines sentence or not.  See
Crosby, 397 F.3d at 114-15.


**The Defendant**


The Court adopts the facts set forth in the
Presentence Investigation Report ("PSR") with respect to
Morillo-Vidal's personal and family history.


**The Offense Conduct**


The following description draws from the PSR.  The
specific facts of the underlying conduct are adopted as set
forth in that report.

4

On February 28, 2010, an officer with the Nebraska
State Patrol ("Officer-1") conducted a traffic stop of a
Recreational Vehicle ("RV"). Officer-1 obtained identification
from the passenger of the RV that identified him as Cartagena.
Officer-1 also obtained identification from the driver of the RV
("CC-1"). Cartagena told Officer-1 that he and CC-1 were headed
to New York. Officer-1 obtained oral consent to search the RV
from CC-1 and discovered, in a storage area within the RV,
approximately 67 kilograms of cocaine. Officer-1 placed
Cartagena and CC-1 under arrest.

Another officer of the Nebraska State Patrol
("Officer-2") read CC-1 his Miranda rights, which he waived, and
agreed to speak with law enforcement agents. CC-1 admitted that
he and Cartagena had separately flown to Phoenix, Arizona, and
were transporting the cocaine to New York City. CC-1 later
testified at the instant trial, and indicated that CC-1 and
Cartagena rented the RV, bought tools to hide the cocaine in the
RV and also bought latex gloves to handle the cocaine. Receipts
for these items, among others, corroborated CC-1's account. CC-1
also testified that CC-1 and Cartagena concocted a story about a
ski trip to tell police officers if they were stopped. Both CC-
1 and Cartagena lied to Officer-1 during the traffic stop by

telling Officer-1 that they had gone skiing.

CC-1 told law enforcement agents on March 2, 2010, that CC-1 and Cartagena were previously involved in trafficking 23 kilograms of cocaine.  CC-1 said that after delivering the cocaine, CC-1 asked Cartagena to accompany him again during a subsequent delivery of the payment of $250,000.  In October 2009, CC-1 and Cartagena flew from New York to Los Angeles, California, to deliver the $250,000 which they had hid in electronic equipment.

Cartagena was also interviewed by law enforcement agents on March 2, 2010, and stated that he and CC-1 were on their way to New York.  Cartagena also stated that a few days before Halloween in 2009, Cartagena and CC-1 had flown with approximately $250,000 from New York to Los Angeles, California.  Cartagena stated he was trying to make money to assist with his financial situation.

CC-1, under the direction of the Drug Enforcement Administration ("DEA"), delivered what appeared to be 47 kilograms of the cocaine recovered on February 28, 2010 to another defendant not named herein ("CC-2") in Sloatsburg, New

York, on March 3, 2010.

On March 4, 2010, CC-2, also working under the direction and monitoring of the DEA, made several phone calls to an individual known as "Bu Bu" (who has not yet been apprehended) regarding the 47 kilograms of cocaine that was to be delivered to Bu Bu.  During the recorded call, Bu Bu informed CC-2 that his "brother" would meet with CC-2 in order to collect the cocaine.

On March 4, 2010, under the direction and monitoring of the DEA, CC-2 spoke with Morillo-Vidal, who is believed to be the "brother" referred to by Bu Bu based on a statement Morillo-Vidal made to CC-2 that was overheard by a law enforcement agent, several times on the telephone.  Morillo-Vidal informed CC-2 that he was en route to meet CC-2 and provided a description of himself and the vehicle he was driving.  CC-2 informed Morillo-Vidal that CC-2 would meet him at a restaurant in Manhattan (the "Restaurant") and that CC-2 would be waiting for him upstairs.

Later in the evening on March 4, 2010, and under the direction and monitoring of the DEA, CC-2 met with Morillo-Vidal

7

at the Restaurant.  When Morillo-Vidal arrived, Morillo-Vidal
entered the Restaurant and walked upstairs.  Morillo-Vidal
introduced himself to CC-2 and told CC-2 "you spoke with my
brother," which is believed to be a reference to Bu Bu.  CC-2
then pointed out CC-2's vehicle to Morillo-Vidal.

CC-2 and Morillo-Vidal exited the Restaurant and
walked towards CC-2's vehicle.  CC-2 opened the hatch of CC-2's
vehicle which contained two bags of what appeared to be
cocaine.  One of the bags was unzipped.  Morillo-Vidal inspected
the unzipped bag, removed one bag from CC-2's vehicle, and began
to walk towards his vehicle with the bag.

Law enforcement agents then placed CC-2 and Morillo-
Vidal under arrest.

Morillo-Vidal was read his Miranda rights, which he
waived, and stated that he went to the Restaurant at the
direction of Bu Bu.  Morillo-Vidal stated that he was unaware
that he was picking up narcotics.  Morillo-Vidal continued to
state that he was there to pick up clothing for a friend who
owns a clothing store.  Morillo-Vidal stated that the meeting
was arranged four days ago and that he had no phone contact with

8

anyone on March 4, 2010, in regards to the meeting at the Restaurant that day. However, phone records showed that Morillo-Vidal had telephone contact with CC-2 and Bu Bu that day.

## The Relevant Statutory Provisions

For Counts 1 and 2, pursuant to 18 U.S.C. §§ 846, 841(b)(1)(A), the mandatory minimum term of imprisonment is 10 years on each count and the maximum term of imprisonment is life.

For Counts 1 and 2, if a term of imprisonment is imposed, a term of at least 5 years supervised release is required on each count, pursuant to 18 U.S.C. §§ 846, 841(b)(1)(A).

For Counts 1 and 2, Defendant is not eligible for probation because the instant offense is one for which probation has been expressly precluded by statute, pursuant to 18 U.S.C. § 3561(a)(2) and 21 U.S.C. §§ 846, 841(b)(1)(A).

The maximum fine that may be imposed is the $4,000,000

9

per count, for a total of $8,000,000, pursuant to 21 U.S.C. §§ 846, 841(b)(1)(A). A special assessment of $100 per count, for a total of $200, is mandatory, pursuant to 18 U.S.C. § 3013.

**The Guidelines**

The November 1, 2010 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a). The Court finds the following with respect to Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

Counts 1 and 2 are grouped together pursuant to § 3D1.2(d) because the offense level is determined largely on the basis of the total quantity of the controlled substance involved. The Guideline for the violation of 21 U.S.C. § 846 is found in § 2D1.1. Defendant was responsible for 47 kilograms of cocaine. Since Morillo-Vidal was involved in a conspiracy and the attempt to distribute and possess with intent to distribute at least 15 kilograms grams but less than 50 kilograms of cocaine, the base offense level is 34, pursuant to the Drug Quantity Table set out in §2D1.1(c)(3).

Accordingly, the applicable offense level is 34.

On January 3, 2007, Morillo-Vidal was arrested and charged with driving without a valid driver's license. On January 23, 2007, Defendant was sentenced in the Osceola County Court in Kissimmee, Florida to court costs and fines of $140.50 and two days credit for time served at the Osceola County Jail. Pursuant to § 4A1.2(c)(1), this conviction warrants zero criminal history points.

On July 9, 2008, Morillo-Vidal was arrested and charged with driving without a valid driver's license. On August 20, 2008, Defendant was sentenced in the Osceola County Court in Kissimmee, Florida to court costs and fines of $640.50 and two days credit for time served at the Osceola County Jail. Pursuant to § 4A1.2(c)(1), this conviction warrants zero criminal history points.

A total of zero criminal history points establishes a Criminal History Category of I, pursuant to the table at Chapter 5, Part A, of the Guidelines.

11

Based on a total offense level of 34 and a Criminal History Category of I, the Guidelines range for imprisonment is 151 to 188 months.

The Guidelines range for a term of supervised release is five years on each count, pursuant to § 5D1.2(c).

Defendant is not eligible for probation because the instant offense is one for which probation has been expressly precluded by statute, pursuant to § 5B1.1(b)(2).

The fine range for the instant offense is from $17,500 to $8 million, pursuant to § 5E1.2(c)(3)(A) and (c)(4). Subject to Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,357.01 to be used for imprisonment, a monthly cost of $328.20 for supervision, and a monthly cost of $2,153.22 for community confinement.

12

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a downward departure from the Guidelines sentence is warranted in the instant case.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant." Pursuant to 18 U.S.C. § 3553 (2)(A), the Court weighs the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

13

The Defendant was arrested in March 2010 after he met with a coconspirator at a restaurant in Manhattan to pick up 47 kilograms of cocaine.  This appears to have been his role in the conspiracy.

Morillo-Vidal has no prior arrests or convictions for drug-related offenses.  His arrest history consists primarily of driving-related offenses such as driving with a suspended license.  He has no reported history of drug use or treatment for substance abuse.  Defendant has a strong record of previous employment.   At the time of his instant arrest, he was reportedly employed as the superintendent for seven apartment buildings in Manhattan, and he continued such employment while on bail.  As reported in the PSR, Defendant previously started and ran a construction business with his father for five or six years.   Morillo-Vidal is 32 and married, and his relationship with his wife appears strong.  They have two children, ages 7 and 9.  According to the PSR, Defendant's family has remained emotionally supportive since his arrest and has visited him in custody.

In light of the nature and circumstances of the

14

offense, the history and characteristics of the Defendant, the need for the sentence to promote respect for the law and to provide just punishment for the offense, the Court finds that a downward departure from the Guideline sentence is appropriate to impose a sentence "sufficient, but not greater than necessary" under 18 U.S.C. § 3553(a).

**The Sentence**

For the instant offense, Morillo-Vidal will be sentenced to 120 months' imprisonment and 5 years' supervised release.

Morillo-Vidal is directed to report to the nearest United States Probation Office within seventy-two hours of release to commence his term of supervised release.    It is recommended that Defendant be supervised by the district of his residence.

As mandatory conditions of his supervised release, Morillo-Vidal shall:  (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; and (4)

15

cooperate in the collection of DNA as directed by the probation
officer.  The Defendant shall refrain from any unlawful use of a
controlled substance and shall submit to one drug testing within
fifteen (15) days of placement on probation or supervised
release and at least two unscheduled drug tests thereafter, as
directed by the probation officer.

Furthermore, the standard conditions of supervision
(1-13), set forth in the judgment, shall be imposed with the
additional special conditions:

(1)   Defendant shall provide the probation officer
with access to any requested financial information.

(2)   Defendant shall not incur new credit charges or
open additional lines of credit without the approval of the
probation officer unless Defendant is in compliance with the
installment payment schedule.

(3)   Defendant shall submit his person, residence,
place of business, vehicle, or any other premises under his
control to a search on the basis that the probation officer has
reasonable belief that contraband or evidence of a violation of

16

the conditions of the release may be found.  The search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

(4)   Defendant shall obey the immigration laws and comply with the directives of immigration authorities.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.

As a result of committing the offense alleged in Counts 1 and 2, Defendant shall forfeit to the United States, pursuant to 21 U.S.C. § 853, including but not limited to, any and all property constituting or derived from any proceeds obtained directly or indirectly as a result of the said violations and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the violations alleged in Counts 1 and 2.

A special assessment of $200, payable to the United

17

States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for September 27, 2011.

It is so ordered.

New York, NY
September 22, 2011

_____
ROBERT W. SWEET
U.S.D.J.

18